**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| CARRIE LEE WATERS, | ) | CASE NO.  3:10-cv-587 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE ZOUHARY |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| MICHAEL J. ASTRUE, | ) | VECCHIARELLI |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | **REPORT & RECOMMENDATION** |

Plaintiff, Carrie Lee Waters, challenges the final decision of Defendant, Michael

J. Astrue, Commissioner of Social Security (the "Commissioner"), denying Plaintiff's

applications for a Period of Disability ("POD") and Disability Insurance Benefits ("DIB"),

and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security

Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* (The "Act").  This Court has jurisdiction

pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States

Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a

Report and Recommendation.

For the reasons set forth below, the Magistrate Judge recommends that the

Commissioner's final decision be AFFIRMED, and judgment entered in favor of the

Commissioner.

1

## I.   PROCEDURAL HISTORY

On April 20, 2007, Plaintiff filed her applications for DIB and SSI.  Both applications alleged a disability onset date of April 16, 2007.  Plaintiff's applications were denied initially on June 11, 2007, and upon reconsideration on January 14, 2008.  Thereafter, on March 14, 2008, Plaintiff requested a hearing before an administrative law judge ("ALJ").

On April 15, 2009, an ALJ held Plaintiff's hearing.  Plaintiff was represented by counsel at the hearing, and Plaintiff and a vocational expert ("VE") testified.  On July 1, 2009, the ALJ found Plaintiff not disabled.  On January 26, 2010, the Appeals Council declined to review the ALJ's Decision; therefore, the ALJ's Decision became the final decision of the Commissioner.  On March 19, 2010, Plaintiff timely filed this action in federal court.

Plaintiff asserts three assignments of error:  (1) the Commissioner failed to meet his burden of showing that Plaintiff could perform jobs that exist in significant numbers in the national economy at Step Five of the disability determination process because the VE did not testify to any semi-skilled sedentary jobs; (2) the ALJ failed to give "good reasons" for giving less weight to one of Plaintiff's treating source's opinions; and (3) the ALJ's Decision is not supported by substantial evidence because one of Plaintiff's treating source's opinions supports the conclusion that Plaintiff is more limited than the ALJ determined in his RFC assessment.

2

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Plaintiff was born on June 14, 1975, and was thirty-one years old on her alleged disability onset date, which made her a "younger individual" as defined by the Social Security Administration.  She had a high school diploma, took some college courses, and was able to communicate in English.  Her past relevant work included employment as a waitress, customer service representative, customer service manager, photographer, office helper, and outside sales representative.

### B.    Medical Evidence

Ms. Waters injured her back in May 2001 when she fell out of a third-story window.  (Tr. 303.)  The fall resulted in a burst fracture of the L1 vertebra.  (Tr. 297.)  CT imaging and x-rays confirmed a complete L1 burst fracture with 90% compromise of the neurocanal.  (Tr. 299.)  The fracture was surgically stabilized with a posterolateral fusion of the T12 - L1 and L1-L2 vertebra using bone grafts and rods.  (Tr. 299-300.)  After rehabilitation, Ms. Waters was able to return to work.  (Tr. 135.)

In February 2003, Ms. Waters fell down a flight of stairs and broke the rods in her back.  (Tr. 261.)  The hardware was surgically removed, although the distal screws were too deep to remove without risk to the nerve root and were, therefore, left in place.  (Tr. 350.)

In early October 2004, Plaintiff presented to Dr. Thomas Andreshak, M.D., with complaints of significant pain when standing, moving, and walking.  (Tr. 259.)  Plaintiff reported that she had been in a car accident on October 9, 2004, wherein she was rear-ended at approximately fifty miles per hour.  (Tr. 259.)  Dr. Andreshak reported that an

x-ray of Plaintiff's back indicated "she had a previous L1 burst fracture . . . that appears well." (Tr. 259.)

On October 14, 2004, Dr. Andreshak reported that an MRI of Plaintiff's back indicated "an old compression fracture of L1 with severe deformity." (Tr. 264.) Dr. Andreshak further reported that the MRI indicated no malalignment, disc herniation, cord compression, narrowing of the neural foramina, cord contusion, myelomalacia, or cord edema. (Tr. 264-65.)

On December 10, 2004, Plaintiff underwent further examination of her back at St. Vincent Mercy Medical Center Radiology Department by Dr. Thomas T. Win, M.D., on referral from Dr. Andreshak. (Tr. 263.) The examination results indicated a "stable compression fracture of L1 with slight kyphosis," and "No abnormal motion or significant change as compared to previous lumbar spine films of 10-9-04." (Tr. 263.)

On January 5, 2005, Plaintiff presented to Dr. Sanjay S. Shah, M.D., on referral from Dr. Andreshak for electromyographic testing of Plaintiff's nerve conduction. (Tr. 261-62.) Dr. Shah reported that a "Straight leg raising test revealed some low back pain." (Tr. 261.) Dr. Shah concluded that "There appears to be electrophysiologic evidence of a chronic bilateral L5 radiculopathy," but that "There does not appear to be evidence of a plexopathy, myopathy ro peripheral polyneuropathy." (Tr. 262.)

On October 29, 2006, Plaintiff presented to the Toledo Hospital Emergency Center in relation to a car accident that occurred the same day. (Tr. 230.) The emergency room report indicated that Plaintiff suffered a neck strain and wrist contusion after she ran into another vehicle at approximately thirty-five miles an hour. (Tr. 231.) Plaintiff reported some head, neck, and left wrist pain; and right-sided thoracic

4

paraspinal musculature pain.  (Tr. 230.)  Plaintiff was given Motrin, Valium, and Vicodin prescriptions and was told to follow up with her primary care physician.  (Tr. 231.)

On June 8, 2007, state agency consulting physician Dr. Gerald Klyop, M.D., performed a physical residual functional capacity assessment of Plaintiff based on Plaintiff's medical records.  (Tr. 273-280.)  Dr. Klyop found Plaintiff could lift twenty pounds occasionally and ten pounds frequently; and that Plaintiff could stand, walk, and sit for six hours in an eight-hour workday.  (Tr. 274.)  Dr. Klyop further opined that Plaintiff could occasionally climb ladders, ropes, and scaffolds; stoop; crouch; frequently climb ramps and stairs; balance; kneel; and crawl.  (Tr. 275.)  On January 12, 2008, state agency reviewing physician Dr. Esperdado Villanueva, M.D., reviewed Plaintiff's medical records and concurred with Dr. Klyop's findings.  (Tr. 291.)

On November 15, 2007, however, Plaintiff's treating physician, Dr. Michael Retholtz, D.O., indicated at the request of the Bureau of Disability Determination that Plaintiff was much more limited by her impairments:

> She has a severe functional limitation in regards to the ability to sit, stand, walk, lift, or carry for any prolonged period of time.  Simple tasks such as going to the grocery store tend to cause severe pain with this patient, leading to her not being able to perform any other duties for the rest of the day.

(Tr. 290.)

On September 30, 2008, Dr. Retholtz referred Plaintiff to Dr. Robert L. Kalb, M.D., a bone, joint, and spine surgeon, for an examination of Plaintiff's back.  (Tr. 353-355.)  Dr. Kalb reported that Plaintiff's symptoms included burning, difficulty walking, numbness, pain, pain readiating downward, stabbing, stiffness, trouble getting out of bed, trouble sitting, trouble sleeping, weakness, and trouble standing.  (Tr. 353.)  Dr.

5

Kalb further indicated that Plaintiff described her pain as aching, constant, sharp, and sore; and that she rated her pain at 5 on a scale of 1 to 10.  (Tr. 353.)  However, Dr. Kalb reported that Plaintiff's functional ability improved, and that her pain decreased, with medication.  (Tr. 354.)

In January 2009, Plaintiff began seeing Dr. Jeffrey Blood, D.O. for primary care upon transfer from her prior treating physician, Dr. Retholtz.  (Tr. 29-30.)

On March 18, 2009, Dr. Blood performed a mental residual functional capacity assessment of Plaintiff.  (Tr. 358-60.)  Dr. Blood indicated that side effects from Plaintiff's pain medications caused extreme limitations in Plaintiff's abilities to understand, remember, and carry out complex instructions and make judgments on complex work-related decisions; marked limitations in her ability to make judgments on simple work-related decisions; and mild limitations in her abilities to understand, remember, and carry out simple instructions.  (Tr. 358.)  Dr. Blood further indicated that Plaintiff's pain caused her to suffer moderate limitations in her ability to respond appropriately to usual work situations and changes in a routine work setting; and mild limitations in her abilities to interact appropriately with the public, supervisors, and co-workers.  (Tr. 359.)

Also on March 18, 2009, Dr. Blood performed a physical residual functional capacity assessment of Plaintiff.  (Tr. 356-357.)  Dr. Blood diagnosed Plaintiff with chronic back pain and indicated that Plaintiff reported her pain at 10 on a scale of 1 to 10.  (Tr. 356.)  Dr. Blood indicated that Plaintiff's pain was sufficiently severe to interfere with her attention and concentration often; that Plaintiff could walk for only one block, sit for only fifteen minutes before she needed to lie down, and stand for only five minutes

6

before she needed to lie down; that Plaintiff required the opportunity to lie down at unpredictable intervals during a work shift; and that Plaintiff could lift one to two pounds occasionally and never lift more than two pounds.  (Tr. 357.)  Dr. Blood further indicated that Plaintiff's symptoms would occur more than ten times during an average work day; that Plaintiff would need more than ten rest breaks in an average work day; and that Plaintiff's impairments and symptoms would cause her to be absent from work more than three times a month.  (Tr. 357.)

### C.    Hearing Testimony

#### 1.    Plaintiff's Testimony

Plaintiff testified to the following at her hearing before the ALJ.  Plaintiff suffered her first back injury after falling out of a three-story window.  (Tr. 26.)  Plaintiff fell down a flight of stairs approximately a year later, which caused further injury to her back and required surgery.  (Tr. 26.)  Plaintiff was also involved in three car accidents between 2005 and 2006, for one of which she was at fault.  (Tr. 27.)  She stopped working as an outside sales representative in April 2007 because, after her last car accident in October 2006, her pain and difficulties with mobility became intolerable.  (Tr. 29.)  Dr. Blood, Plaintiff's primary care physician at the time of the hearing, treated Plaintiff for her back as well as other health concerns.  (Tr. 30.)

Plaintiff was married and had four children ranging in age from twelve to fourteen years.  (Tr. 30-31.)  Plaintiff lived with her husband and children, and Plaintiff's husband supported the family.  (Tr. 31.)

Plaintiff spent her days laying in bed, watching television, and knitting.  (Tr. 31.)  Plaintiff was unable to perform daily household activities such as cooking, cleaning,

7

shopping, scrubbing the floors, vacuuming, washing dishes, doing the laundry, and taking care of the family dog.  (Tr. 32, 38.)  Plaintiff's husband and daughters did the household chores for Plaintiff.  (Tr. 32.)  Plaintiff could only occasionally fold a load of washed laundry.  (Tr. 32.)

Plaintiff drove a car once or twice a week for such intermittent needs as picking up her children from school if they stayed late, picking up milk from the corner store, or visiting her doctor.  (Tr. 37, 38.)  She did not drive more often because of drowsiness and nausea caused by her OxyContin medication.  (Tr. 39.)

Plaintiff visited her doctor approximately once every three months.  (Tr. 33.) She and her husband also saw a therapist to cope with the stresses of their married life and the challenges of raising their children.  (Tr. 33.)  Plaintiff was able to attended church only once every one or two months.  (Tr. 36.)

In 2006, Plaintiff and her family flew to Georgia to spend Thanksgiving with their extended family.  (Tr. 35.)  They stayed in Georgia for a week.  (Tr. 35.)  For Christmas of 2008, Plaintiff and her family went to Florida to visit other family members.  (Tr. 35.) Plaintiff flew to Florida while her husband drove their children because Plaintiff "couldn't handle the drive."  (Tr. 35.)  While in Florida, Plaintiff spent her time in bed at the hotel and only was able to play board games with her family in the hotel room and go out to dinner.  (Tr. 35.)

Plaintiff was able to lift no more than five pounds.  (Tr. 37.)  Her pain prevented her from walking for more than five to ten minutes.  (Tr. 37.)  She was unable to sit for more than a half-hour before suffering excruciating pain.  (Tr. 37.)

Plaintiff was literate and could use a computer.  (Tr. 38.)  However, Plaintiff was

8

unable to use the computer in her home often and for extended periods of time because it was located in the basement of her house, and because it was impracticable to attach the computer to her bed so she could use it while lying down.  (Tr. 39-40.)

### 2. Vocational Expert Testimony

The VE testified that all of Plaintiff's past relevant work was semi-skilled.  (Tr. 42-43.)  The ALJ posed the following hypothetical person to the VE:

> We have a hypothetical claimant, a younger individual, completed high school plus some years of college approaching an associate degree, limited as follows.  Limited to a sedentary level of work, which would allow for a sit/stand option for comfort, and that is the only limitation.

(Tr. 43-44.)  The VE testified that such a hypothetical person could not perform Plaintiff's past relevant work.  The VE further testified that such a hypothetical person would have no transferrable skills, but that such a person would be able to make adjustments to other work.  (Tr. 44.)  The VE then testified to three jobs that such a hypothetical person could perform: receptionist (SVP level 4,[1] with 20,000 positions in Ohio and 500,000 positions nationally); order clerk (SVP level 4, with 8,000 positions in Ohio and 200,000 nationally); and data-entry operator (SVP level 4, with 20,000 positions in Ohio and 500,000 nationally).  (Tr. 44.)

Plaintiff's Counsel asked whether further limitations such as those indicated by Dr. Blood—the need to lie down after sitting for fifteen minutes or standing for five minutes, the need to lie down at unpredictable intervals during a work shift, the need to

---

[1] SVP stands for Specific Vocational Preparation.  Dictionary of Occupational Titles, App. C (4th ed., rev. 1991), *available at* http://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOTAPPC.HTM (last visited Feb. 7, 2011).  An SVP level of 4 indicates that such a job requires between three and six months to learn.  *Id.*

take more than ten unscheduled breaks during an eight-hour workday, and the inability to occasionally lift more than two pounds—would affect such a hypothetical person's ability to work.  (Tr. 46.)  The VE testified that such a hypothetical person would be precluded from all work.  (Tr. 46.)

The VE based his testimony on the Dictionary of Occupational Titles ("DOT"); however, because the DOT does not recognize a sit/stand option for jobs, the VE testified that he also based his testimony on his knowledge and experience.  (Tr. 44-45.)

### III.    STANDARD FOR DISABILITY

A claimant is entitled to receive benefits under the Social Security Act when she establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981).  A claimant is considered disabled when she cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 416.905(a).  To receive SSI benefits, a recipient must also meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits.  20 C.F.R. §§ 404.1520(b) and 416.920(b).  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of

10

disability.  20 C.F.R. §§ 404.1520(c) and 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience.  20 C.F.R. §§ 404.1520(d) and 416.920(d).  Fourth, if the claimant's impairment does not prevent her from doing her past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) and 416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), and 416.920(g).

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through at least the date of this decision.

2.    The claimant has not engaged in substantial gainful activity since April 16, 2007, the alleged onset date.

3.    The claimant has the following severe impairments:  compression of the lumbar spine and residual pain secondary to lumbar spinal fusion and instrumentation removal surgeries.

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments.

5.    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform sedentary work . . . except that the claimant requires a sit/stand at will option for comfort.

11

6.      The claimant is unable to perform any past relevant work.

. . . . .

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or nor the claimant has transferrable job skills.

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

11.     The claimant has not been under a disability, as defined in the Social Security Act, from April 16, 2007, through the date of this decision.

(Tr. 12-18.)

## V.    LAW & ANALYSIS

### A.    Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010). Review must be based on the record as a whole. *Heston v. Comm'r of Social Security*, 245 F.3d 528, 535 (6th Cir. 2001). The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ. *Id.* However, the court does not review the evidence *de novo*, make credibility determinations, nor weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported

12

by substantial evidence in the record.  *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Brainard*, 889 F.2d at 681.  A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion.  *Ealy*, 594 F.3d at 512.

### B.  The Commissioner's Burden of Showing That Plaintiff Could Perform a Significant Number of Jobs in the National Economy

At Step Five of the disability determination process, the Commissioner has the burden of showing that a claimant is able to perform jobs that exist in significant numbers in the national economy.  *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999).  An ALJ may meet this burden by relying on the testimony of a VE in response to a hypothetical question that accurately portrays the claimant's physical and mental limitations.  *Workman v. Comm'r of Soc. Sec.*, 105 F. App'x 794, 799 (6th Cir. 2004) (quoting *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987)).  Here, the ALJ relied on a VE's testimony to determine that Plaintiff could perform three types of jobs that exist in significant numbers in the national economy: receptionist, order clerk, and data-entry operator.  Plaintiff argues, however, that the jobs to which the VE testified were not jobs that Plaintiff could actually perform because they constitute "semi-skilled" work.[2]  Plaintiff contends that a claimant must have

---

[2] The VE and ALJ did not define the jobs to which the VE testified as "semi-skilled" work.  Plaintiff appears to conclude that the jobs to which the VE testified constitute "semi-skilled" work because the VE attributed the jobs a SVP level of 4, which indicates that the jobs require between three and six months to learn.  *See* Dictionary of Occupational Titles, App. C, *supra* note 1.  Plaintiff

13

transferrable skills to be able to perform semi-skilled work and, because Plaintiff had no

transferrable skills, she was incapable of performing the semi-skilled work to which the

VE testified.  Plaintiff concludes that the Commissioner failed to meet his burden

because the VE did not testify to any *unskilled* work that Plaintiff could perform.  The

Court finds that Plaintiff's argument lacks merit.

When a claimant is found to be unable to perform her past relevant work, an ALJ

must determine whether the claimant is able to adjust to and perform other work that

exists in significant numbers in the national economy based on the claimant's RFC, age,

education, and work experience.  20 C.F.R. §§ 404.1560(c) *and* 416.960(c); *Wilson v.*

*Barnhart*, 284 F.3d 1219, 1227 (6th Cir. 2002).  If the claimant suffers a non-exertional

impairment, the ALJ may use the Medical-Vocational Guidelines (the "Grids") as a

framework to evaluate vocational factors, but must also introduce independent

evidence, preferably through a VE's testimony, of the existence of jobs in the national

economy that the claimant can perform.  *Wilson*, 284 F.3d at 1227.

Under the regulations, transferability of skills may be a determinative factor when

the claimant is of advanced age (age fifty-five or older) and suffers a severe impairment

that limits her to sedentary or light work.  20 C.F.R. § 404.1568(d)(4).  However, under

the Grids, a "younger individual" between the ages of eighteen and forty-four with a high

school diploma, and who is limited to sedentary work, is generally not considered to be

---

contrasts this three- to six-month training requirement with the definition of
"unskilled work," which provides that a person can usually learn how to perform
unskilled work within thirty days.  20 C.F.R. §§ 404.1568(a), 416.968(a).
Plaintiff seems to deduce that, if the jobs to which the VE testified require more
time to train than typical unskilled work, the jobs must be semi-skilled rather
than unskilled work.

14

disabled even if she lacks transferable job skills.  *Garred v. Astrue*, 383 F. App'x 820, 824 (11th Cir. 2010) (citing 20 C.F.R. pt. 404, subpt. P, app. 2, §§ 201.00(h)(2), (3), *and* 201.28).

Here, the ALJ found that Plaintiff was a younger individual with a high school diploma who could not perform her past relevant work and was limited to sedentary work.  The ALJ used the Grids as a framework to determine that Plaintiff's lack of transferrable skills was immaterial to Plaintiff's ability to adjust to other work.  The ALJ then obtained testimony from a VE that a person with Plaintiff's RFC, age, education, and work experience could perform other jobs in the national economy.  Plaintiff has not articulated how the ALJ erred in this analysis.

Instead, Plaintiff insists that 20 C.F.R. §§ 404.1568(d)(1) and 416.968(d)(1) support her proposition that a claimant with no transferrable skills is *per se* limited to unskilled work.  The Court disagrees, as these administrative provisions merely define what kinds of skills from past relevant work experience constitute "transferrable skills":

> What we mean by transferable skills.  We consider you to have skills that can be used in other jobs, when the skilled or semi-skilled work activities you did in past work can be used to meet the requirements of skilled or semi-skilled work activities of other jobs or kinds of work. This depends largely on the similarity of occupationally significant work activities among different jobs.

20 C.F.R. §§ 404.1568(d)(1), 416.968(d)(1).  Moreover, Plaintiff cites no case law indicating that a claimant with Plaintiff's RFC, age, education, work experience, and lack of transferrable skills is *per se* limited to unskilled work, and the Court is unaware of any such legal authority.  Therefore, this assignment of error lacks merit.

**C.    The ALJ's Assessment of Plaintiff's Treating Source's Opinions**

Plaintiff argues that the ALJ failed to give sufficient "good reasons" for discounting

15

her treating physician, Dr. Blood's, opinions that Plaintiff needed to lie down after sitting for only fifteen minutes at a time and standing for only five minutes at a time, and that Plaintiff needed to lie down at unpredictable intervals during the day.  For the reasons set forth below, the Court finds that Plaintiff's argument lacks merit.

An ALJ must provide "good reasons" for discounting a claimant's treating source's opinions that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating source's opinions and the reasons for that weight.  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see* 20 C.F.R. §§ 404.1527(d)(2) *and* 416.927(d)(2); S.S.R. 96-2p, 1996 WL 374188, at *5.

Defendant contends that Plaintiff's argument lacks merit because Dr. Blood is not a treating source.  A treating source is a claimant's own physician, psychologist, or other acceptable medical source who provides the claimant, or has provided the claimant with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with the claimant.  *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 506 (6th Cir. 2006) (quoting 20 C.F.R. § 404.1502).  A claimant has an ongoing treatment relationship with an acceptable medical source when the medical evidence establishes that the claimant sees, or has seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for the claimant's medical condition(s).  20 C.F.R. § 404.1502.  A claimant must have had an ongoing treatment relationship with her physician at the time she appeared at her disability hearing for that physician's opinions to be considered treating source opinions. *Kornecky*, 167 F. App'x at 506.

Defendant argues that, although Dr. Blood became Plaintiff's primary care

physician upon transfer from Dr. Retholtz, Dr. Blood did not see Plaintiff often enough before the hearing to have an ongoing treatment relationship with her.  Indeed, Plaintiff testified that she was transferred to Dr. Blood only three months before her hearing, and that she visited her doctor about once every three months.  These facts lead to the deductive conclusion that Plaintiff saw Dr. Blood only once.  Generally, one visit with a physician is not enough to establish an ongoing treatment relationship.  *See* *Kornecky,* *167 F.App'x at 506-507* (noting that "a plethora of decisions unanimously hold that a single visit does not constitute an ongoing treatment relationship," and that, "depending on the circumstances and the nature of the alleged condition, two or three visits often will not suffice for an ongoing treatment relationship"); *Daniels v. Comm'r of Soc. Sec.,* *152 F. App'x 485, 491 (6th Cir. 2005)* (finding that a physician who saw the claimant two times for his back pain did not qualify as a treating source).

The Court need not determine whether Dr. Blood is a treating source because, even if Dr. Blood did qualify as a treating source, Plaintiff's assignments of error would still lack merit.  If the opinion of a treating source is not accorded controlling weight, an ALJ must consider certain factors—namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source—in determining what weight to give the opinion. *Bowen v. Comm'r of Soc. Sec.,* *478 F.3d 742, 747 (6th Cir. 2007)* (citing *20 C.F.R. §§* *404.1527(d)(2)*).  Here, the ALJ did not give Dr. Blood's opinions controlling weight because the severity of the limitations opined by Dr. Blood were "largely unsupported by the record evidence," and were "not reflected in any treatment records from Dr. Blood."

17

(Tr. 15.)  Although the ALJ noted that both Dr. Blood and Plaintiff indicated that Plaintiff must lie down after sitting or standing for short periods of time, the ALJ found that "this assertion is inconsistent with the record evidence and the claimant's own testimony." (Tr. 15.)  The ALJ noted the following, further facts from the record that contradicted the limitations opined by Dr. Blood:  Plaintiff planned her own wedding in 2007; recently traveled to Florida by airplane; drove her car one or two times a week; occasionally attended church services; was able to knit; and was able to sit through her hearing for forty-five minutes without any apparent difficulty.  (Tr. 15.)

Plaintiff contends that the ALJ's analysis of Dr. Blood's opinions was deficient for two reasons.  First, Plaintiff argues that the ALJ did not sufficiently explain *how* Plaintiff's daily activities, travel, and presentation at the hearing belied Dr. Blood's opinions that Plaintiff would need to lie down often throughout a workday.  Second, Plaintiff argues that the ALJ "provided no mention" of the various factors that an ALJ is required to consider when he finds that a claimant's treating source's opinions do not have controlling weight—namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source.  Both contentions lack merit.

Plaintiff's first contention lacks merit because Plaintiff fails to explain how her daily activities, travel, and presentation at the hearing were inadequate evidence to justify giving Dr. Blood's opinions less weight; Plaintiff fails to explain how much more detail the ALJ should have given when discussing this evidence; and Plaintiff does not cite any legal authority supporting her argument that the ALJ's discussion should have

18

included more detail.  Moreover, Plaintiff overlooks the significance of the fact that the ALJ gave less weight to Dr. Blood's opinions because the record indicated that Dr. Blood's opinions were not supported by his own treatment records.  In sum, Plaintiff does not explain how the ALJ's analysis of Dr. Blood's opinions, as a whole, was inadequate to justify giving those opinions less weight.

Plaintiff's second contention lacks merit because the ALJ's discussion of Plaintiff's daily activities, travels, and presentation—and the consistency of Dr. Blood's opinions with the rest of the record evidence and Dr. Blood's own treatment record—indicates that the ALJ *considered* the various factors necessary to make a proper determination of the weight to be accorded to Dr. Blood's opinions.  Plaintiff presents no legal authority indicating that the ALJ was required to address such factors more directly.

The Court finds that the ALJ's explanation for the weight he gave Dr. Blood's opinions was sufficiently specific to make clear to any subsequent reviewers the weight he gave to Dr. Blood's opinions and the reasons for that weight.  Therefore, this assignment of error lacks merit.

### D.      The ALJ's RFC Assessment and Substantial Evidence

Plaintiff contends that the ALJ's Decision is not supported by substantial evidence because Dr. Retholtz's opinions, to which the ALJ gave great weight, support the conclusion that Plaintiff's RFC is more restricted than the ALJ determined; that is, that Plaintiff actually cannot perform even semi-skilled, sedentary work with an at-will sit/stand option.  For the following reasons, this assignment of error lacks merit.

A claimant's RFC is not a medical opinion, but an administrative determination

19

reserved to the Commissioner.  *See* 20 C.F.R.§ 416.945(e).  As such, the ALJ bears the responsibility for assessing a claimant's RFC based on *all* of the relevant evidence.  *See* 20 C.F.R. § 416.945(a).  Moreover, a decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion. *Ealy*, 594 F.3d at 512.

Here, the ALJ made his RFC determination based not only on Dr. Retholtz's medical opinions of Plaintiff's functional capacity, but also on Plaintiff's testimony, daily activities, and presentation at the hearing; and on the rest of the record evidence.  (Tr. 13-16.)  Plaintiff does not explain how the record as a whole lacks substantial evidence to support the ALJ's RFC determination.  Therefore, this assignment of error lacks merit.

## VI.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED, and that judgment be entered in favor of the Commissioner.

s/ *Nancy A. Vecchiarelli*
U.S. Magistrate Judge

Date: February 7, 2011

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1).  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**